[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 45 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 46 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 47 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 48 
The appellant, Wilson Earl Robitaille,[2] was convicted of six counts of capital murder for murdering Alisa Taylor and her two children — seven-year-old Robin and four-year-old Trent — during the course of a robbery.[3] The jury unanimously recommended that Robitaille be sentenced to death. The trial court accepted the jury's recommendation and sentenced Robitaille to death.
The circuit court made the following findings of fact in its sentencing order:
 "In the early morning hours of [May] 11, 2001, the defendant drove up to Hamilton, Alabama, from Phenix City, Alabama, to burglarize the home of a couple whom he had met while living in Hamilton during the late 1990's. This couple owned a jewelry store and he thought he knew where jewelry was kept in their home. After arriving in Hamilton he slept in his car until day-light and then went to a gas station convenience store and visited with some of his old acquaintances. He then drove to a place near the home of the couple whose home he planned to burglarize and parked his car on a side road nearby. He waited for the couple to leave home for work but the man did not leave. He decided to abandon the burglary plan and just borrow enough money from someone to get back to Phenix City. Although he met someone he was going to borrow the money from his pride would not let him ask for the money.
 "He wound up at the home of Stuart Taylor and wife Alisa and their two children. He had worked for the Taylors previously and had actually lived in a camper in their backyard while working on their house. He was well acquainted with the Taylors. He knocked at the kitchen door at the Taylor home and was invited in by Alisa Taylor. They sat down at the kitchen table and were engaged in conversation when Alisa exited the room to tend to the children. While she was gone Robitaille noticed Alisa's purse on the counter and went over to get enough money to buy gas to get him back to Phenix City. Again he was too proud to ask for it. He was in the act of going through her purse when she unexpectedly reentered the kitchen and saw what he was doing. She ran over to him and tried to stop him. This was the beginning of one of the most horrifying events that has ever taken place.
 "Robitaille began stabbing Alisa Taylor with a leatherman's or multipurpose tool. [Alisa] tried to get away by running to another room. He followed her and when Robin began screaming he got a steak knife and went after her. [Robin] was able to get out of the kitchen door on the carport but Robitaille caught her and brought her back into the house. He broke the blade of one steak knife off in her back and then got *Page 50 
another and followed her into her bedroom and stabbed her until she was dead.
 "He then went upstairs where Alisa and Trent were. Alisa asked him why he was doing this. He replied that he had gone too far now. He then proceeded to stab her until she was lying helpless and dying on the floor. He then hunted Trent down where his mother had told him to hide in a storage area behind a door in the bedroom and stabbed him to death. Then he went back out in the hall and told Alisa that he was sorry but she was not able to speak as she drew her last breath. He obviously went back to each victim and stabbed them again just to make sure they were dead since some of the stab wounds did not bleed, indicating no blood pressure at the time they were inflicted.
 "After making sure that all three were dead he then proceeded to steal bottles filled with coins, knives, scissors, and Alisa's purse with its contents. Then he fled to Phoenix City where he was arrested. He later took police to a swampy area Where he had disposed of Alisa's purse and some of the murder weapons."
The State's evidence also tended to show that on May 11, 2001, Stuart Taylor arrived at his home and discovered the bodies of his wife and daughter. His son's body was later discovered by police. Dr. Joseph Embry testified that all three victims had been stabbed to death — Alisa had been stabbed 18 times, Robin had been stabbed 17 times, and Trent had been stabbed 10 times.
Stuart Taylor testified that he knew Robitaille because Robitaille had worked with him at Fikes Chevrolet-Buick automobile dealership and had also done work on his house. He said that approximately one year before the murders Robitaille had lived in a camper behind his house. At the time of the murders Robitaille was living in Phenix City with his girlfriend.
The State also presented evidence indicating that Robitaille confessed to murdering Alisa, Robin, and Trent Taylor. He gave a detailed account of the injuries that he had inflicted on each victim. Robitaille's statements were corroborated by the wounds each victim sustained. Robitaille also led police to a swampy area in Lee County where he had disposed of Alisa's purse and several knives that were used in the murders.
Robitaille testified in his own defense and offered his own account of the events leading up to the triple homicide. He testified that he had worked for Stuart Taylor delivering drugs to Tennessee and that on the day of the murders he was scheduled to travel to Tennessee to deliver crystal methamphetamine. While he was in Hamilton, he said, he decided to visit Alisa Taylor. Robitaille said that when he was in the house he heard a noise and started to walk down the stairs. Someone, he said, hit him on the shoulder and the next thing he remembered was waking up in his girlfriends's sport-utility vehicle. He went back inside the house, he said, and discovered the bodies of Alisa and Robin.
The jury chose not to believe Robitaille's account of the events but instead convicted Robitaille of six counts of capital murder.
A separate sentencing hearing was held in accordance with § 13A-5-45, Ala. Code 1975. The jury was instructed to complete special interrogatories concerning the existence of any aggravating circumstance that it found to exist. The jury unanimously found the existence of four aggravating circumstances — that the offense was committed by a defendant who was under a *Page 51 
sentence of imprisonment, that the murders were committed during the course of a robbery, that the capital murders were especially heinous, atrocious, or cruel as compared to other capital murders, and that the defendant caused the death of two or more persons by one act or pursuant to one scheme or course of conduct. The jury unanimously recommended that Robitaille be sentenced to death.
In accordance with § 13A-5-47, Ala. Code 1975, the circuit court held a separate sentencing hearing and then sentenced Robitaille to death. This appeal, which is automatic in a death-penalty case, followed. See § 13A-5-53, Ala. Code 1975.
 Standard of Review
Because this is an appeal from a sentence of death this Court must search the record for any plain error. Rule 45A, Ala.R.App.P., states:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
In Ex parte Bryant, 951 So.2d 724 (Ala. 2002), the Alabama Supreme Court explained:
 "`"`Plain error' arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings."' Ex parte Womack, 435 So.2d 766, 769 (Ala. 1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir. 1981)). See also Ex parte Woodall, 730 So.2d 652
(Ala. 1998). `"In other words, the plain-error exception to the contemporaneous objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'"' Ex parte Land, 678 So.2d 224, 232
(Ala. 1996) (quoting United States v. Young, 470 U.S. 1, 15 (1985) (quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14 (1982))). `To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App. 1998), aff'd, 778 So.2d 237
(Ala. 2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233
(2001). This Court may take appropriate action when the error 'has or probably has adversely affected the substantial rights of the appellant.' Rule 45A, Ala. R.App.P. `[A] failure to object at trial, while not precluding our review, will weigh against any claim of prejudice.' Ex parte Woodall, 730 So.2d at 657 (citing Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991))."
951 So.2d at 727 (emphasis added). See also Johnson v.State, 820 So.2d 842, 850 (Ala.Crim.App. 2000).
 Guilt-Phase Issues I.
Robitaille argues that he was entitled to have two attorneys appointed to represent him in his capital trial. He cites § 13A-5-54, Ala. Code 1975, in support of his argument.[4]
The record contains no objection at trial by counsel regarding the number of counsel appointed to represent Robitaille. The only time that this matter was brought to the circuit court's attention was when Robitaille *Page 52 
was asked if he had anything to say before his sentence was pronounced. Robitaille stated: "Law states I'm supposed to have two lawyers during a capital case. They only gave me one." This issue was not raised earlier but only at this late stage of the proceedings.
Section 13A-5-54, Ala. Code 1975, states:
 "Each person indicted for an offense punishable under the provisions of this article who is not able to afford legal counsel must be provided with court appointed counsel having no less than five years' prior experience in the active practice of criminal law."
This Court previously addressed this issue in Whitehead v.State, 777 So.2d 781, 851 (Ala.Crim.App. 1999):
 "Whitehead also contends that he was entitled, under both Alabama and federal constitutional law, to `two attorneys who were experienced in criminal and capital litigation.' (Issue XVII in Whitehead's brief to this court, p. 70.) In support of his claim, Whitehead cites this court to § 13A-5-54, Ala. Code 1975, which provides that a person indicted for a capital offense who is not able to afford an attorney must be provided with court-appointed counsel having no less than five years' prior experience in the active practice of criminal law. Initially we note that Whitehead did not raise this issue in the trial court; therefore, our review will be for plain error. Rule 45A, Ala.R.App.P.
 "As the state correctly points out in its brief to this court, Whitehead does not argue on appeal, nor does the record indicate, that his appointed attorney, Hoyt Baugh, lacked the requisite five years' experience in the active practice of criminal law required under § 13A-5-54. Whitehead complains only that he should have been appointed two attorneys instead of one. However, under § 13A-5-54, contrary to Whitehead's claim, Whitehead was only entitled to one attorney with five years' experience in the active practice of criminal law; therefore, because § 13A-5-54 does not provide for the appointment of two attorneys with five years' experience in the active practice of criminal law, we find that Whitehead had the counsel to which he was entitled."
While we recognize that in some cases there may be a need to appoint two attorneys, Alabama has no statute requiring that two attorneys be appointed to a capital defendant. Robitaille makes no argument that his appointed attorney, John H. Wiley III, did not have the requisite five years of experience as required by law.[5] Robitaille "had the counsel to which he was entitled." Whitehead, 777 So.2d at 851.
 II.
Robitaille next argues that alternate jurors were not properly excused. Robitaille's entire argument on this issue consists of the following:
 "Alabama statutory law requires that alternate jurors be selected independently, and excused when the jury begins to deliberate. See: Rule 18.4(g), [Ala.R.Crim.P.]. This was not done in this case."
This issue was not raised in the circuit court; therefore, we apply a plain-error standard of review. See Rule 45A, Ala. R.App.P. *Page 53 
Rule 18.4(g)(1), Ala.R.Crim.P., states, in part: "An alternate juror who does not replace a principal juror shall be discharged at the time the. jury retires to consider its verdict." This identical provision is contained in § 12-16-100(b), Ala. Code 1975.
Two alternate jurors were selected in this case. There is no specific reference in the record indicating that the two alternates were excused before deliberations. However, the record does show that when the jury broke for its first recess after deliberations had started, the circuit court stated: "[D]o not discuss it any further, even among yourselves, until all of you are back in the jury room. All twelve of you are there before you discuss it even among yourselves." (Emphasis added.) Moreover, when the jury was polled the record indicates that there were 12 affirmative responses. Also, at the penalty phase the jury's recommendation shows that 12 jurors recommended death and 0 jurors recommended life imprisonment without the possibility of parole.
There is no provision in Rule 18.4, Ala.R.Crim.P., or § 12-16-100(b), Ala. Code 1975, that states that when the circuit court excuses the alternate jurors the court must affirmatively state on the record that they were excused. Here, there is no question that only 12 jurors deliberated and only 12 jurors returned a guilty verdict and a recommendation of death. "A reviewing court cannot predicate error on matters not shown by the record. Watson v. State, 398 So.2d 320
(Ala.Cr.App. 1980), cert. denied, 398 So.2d 332 (Ala. 1981). Indeed, a silent record supports a judgment."Robinson v. State, 444 So.2d 884, 885 (Ala. 1983). For these reasons we find no error.
 III.
Robitaille argues that his right to be present at all critical stages of the proceedings against him was violated when he was absent for a portion of Dr. Joseph Embry's testimony. He asserts that a capital defendant cannot waive his right to be present during a critical stage of the proceedings and because the record shows that he was absent during some of the State's testimony he is entitled to a new trial. He relies on Rule 9.1, Ala.R.Crim. P., to support this assertion. This issue was never raised in the circuit court; therefore, we are limited to a plain-error analysis. See Rule 45A, Ala.R.App.P.
The record shows that during Dr. Embry's testimony the following occurred:
 "[Defense counsel]: We are here at a sidebar conference. Mr. Robitaille has asked to be excused from the courtroom during the showing of the autopsy photographs.
 "The Court: Motion is granted."
There is no dispute that Robitaille had a constitutional right to be present during Dr. Embry's testimony. Article I, § 6, Ala. Constitution of 1901, provides: "[I]n all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either . . . [and] to be confronted by the witnesses against him. . . ." See Rule 9.1(a), Ala.R.Crim.P.
Section (b) of Rule 9.1 provides, in pertinent part:
 "[A] defendant may waive the right to be present at any proceeding in the following manner:
 "(i) With the consent of the court, by an understanding and voluntary waiver in open court or by a written consent executed by the defendant and by the defendant's attorney of record, filed in the case.
 "(ii) By the defendant's absence from any proceeding, upon the court's finding that such absence was voluntary *Page 54 
and constitutes an understanding and voluntary waiver of the right to be present, and that the defendant had notice of the time and place of the proceeding and was informed of the right to be present."
Subsection (2) of `Rule 9.1(b), Ala. R.Crim.P., however, provides: "A defendant may not waive the right to be present if:
 ". . . .
 "(ii) The defendant has been convicted of an offense that may be punishable by death and sentence is being imposed."
The Committee Comments to Rule 9.1 state:
 "Section (b) allows a defendant to waive the right to be present. The defendant may make an express waiver in open court or may waive the right by voluntary absence from the proceeding. See Taylor v. United States, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174
(1973)."
This Rule recognizes that a capital defendant may waive his right to be present at the guilt phase of a capital trial but not at the sentencing phase. Rule 9.1, Ala. R.Crim.P., was amended effective December 1, 1997, specifically to allow a capital defendant the right to waive his presence at the guilt phase of the capital proceedings. Prior to 1997 a defendant charged with a capital offense could not waive his right to be present at any phase of the capital trial. The amendment was a departure from the previous rule.
It appears that some discussion took place when Robitaille asked to be excused from the courtroom. We question whether the entire discussion is contained in the record. However, during Robitaille's testimony the following occurred:
 "[Defense counsel]: You weren't in here during the autopsy report? "[Robitaille]: No, sir, I didn't want to look at it.
 "[Defense counsel]: I guess we should explain. Tell the jury why you were not in here?
 "[Robitaille]: I thought the world of Trent and Robin, and Alisa Stuart and them have been good to me, you know, I mean, I just didn't want to see them.
 "[Defense counsel]: And did you ask me to ask the judge to let you be excused?
 "[Robitaille]: Yes, sir."
We strongly encourage trial judges to record all discussions with defendants when those discussions concern a defendant's waiver of his right to be present at any phase of his trial. Here, it is clear from Robitaille's testimony that he voluntarily waived his right to be present during part of Dr. Embry's testimony. Based on the record in this case we find no error.[6]
 IV
Robitaille argues that his statements to police should have been suppressed because, he argues, they were involuntary. Specifically, he asserts that the statements were the result of sleep deprivation, "sexual terror," starvation, and promises made by police.
The record shows that a lengthy suppression hearing was held in this case. Numerous witnesses testified for the State and Robitaille testified for the defense.[7] *Page 55 
The testimony both at the suppression hearing and at trial showed that on May 11, 2001, Robitaille was arrested for violating the terms of his probation. He was taken to Russell County jail and later questioned. Heath Taylor, chief investigator with the Russell County Sheriffs Office, testified that he initially questioned Robitaille in the Russell County jail on May 11, 2001, and that Robitaille invoked his right to counsel and all questioning ceased.[8] Kenneth Mays, an investigator with the district attorney's office in Marion County, also corroborated Taylor's testimony. Mays said that Robitaille was then transported to the Marion County jail. Steven Allen Scott, a trusty at the Marion County jail, testified that on May 13, 2001, Robitaille gave him a note that said he wanted to speak with the detectives. Ronald Keith Lindsey, a jailer at Marion County jail, testified that the note was a business card from a detective.
Mays testified that on May 13, 2001, he went to the Marion County jail and read Robitaille his Miranda[9]
rights, and that Robitaille signed a waiver-of-rights form. Robitaille gave another statement to police on May 14, 2001. He was again read his Miranda rights and signed a waiver-of-rights form. During this statement he confessed to murdering Alisa, Robin, and Trent and gave a very detailed statement about the murders. Robitaille then led police to a swampy area in Lee County where he had disposed of Alisa's purse and several knives used in the murders. Phillip King, an investigator with the Hamilton Police Department, testified that no promises or inducements were made to Robitaille in order to secure his confession.
At the suppression hearing Robitaille testified that before he made the statement he was promised that the local district attorney would not try the case, that he would be acquitted based on an insanity defense, that police would return the photograph of his daughters that had been taken from him when he was arrested, and that he would be allowed to visit his mother in Columbus, Georgia. He also testified that he was locked up in an isolated cell with a homosexual trusty, he was fed watered-down grits, and he had not slept in over 48 hours at the time that he confessed.
We have reviewed the videotapes of the statements Robitaille gave to the authorities. In the May 13, 2001, statement Robitaille admitted that he had been well treated, had rested, and had eaten. There is no indication in any of the videotapes that Robitaille was mistreated or coerced in order to secure his confession.
When reviewing a ruling on the voluntariness of a confession, we apply the standard articulated by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala. 1998):
 "For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala. 1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court's determination will not be disturbed unless it is contrary *Page 56 
to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177
(Ala.Crim.App. 1984). . . .
 "The Fifth Amendment to the Constitution of the United States provides in pertinent part: `No person . . . shall be compelled in any criminal case to be a witness against himself. . . . Similarly, § 6 of the Alabama Constitution of 1901 provides that `in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself.' These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
 "It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568
(1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, `if his will has been overborne' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
 "The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380
(Ala.Crim.App. 1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859
(Ala.Crim.App. 1978) (stating that the true test to be employed is "whether the defendant's will was overborne at the time he confessed') (emphasis added)."
718 So.2d at 729 (footnote omitted).
Furthermore,
 "`[c]onflicting evidence given at [a] suppression hearing presents a credibility choice for the trial court.' Atwell v. State, 594 So.2d 202, 212
(Ala.Cr.App. 1991), cert. denied, 594 So.2d 214 (Ala. 1992). `[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, and is not to be reversed absent a clear abuse of discretion.' Jackson v. State, 589 So.2d 781, 784 (Ala.Cr.App. 1991) (citations omitted)."
Rutledge v. State, 651 So.2d 1141, 1144-45
(Ala.Crim.App. 1994). "It is true that, absent clear error, the trial court's credibility choices on issues of fact at suppression hearings are binding on this Court. Powell v.State, 624 So.2d 220 (Ala.Cr.App. *Page 57 
1993)." State v. Hill, 690 So.2d 1201, 1204 (Ala. 1996).
Here, after making a credibility decision based on conflicting evidence, the circuit court held that Robitaille's statements were voluntary. We see no evidence indicating that the circuit court abused its discretion in so holding. Robitaille's statements were correctly received into evidence.
 V.
Robitaille argues that the circuit court erred in admitting what he says was hearsay evidence at the guilt phase of his trial. Specifically, he challenges the admission of three different instances of testimony he alleges was hearsay. There were no objections to any of the challenged evidence; therefore, we apply a plain-error standard of review. See Rule 45A, Ala.R.App.P.
 A.
Robitaille first argues that the circuit court erroneously allowed Robitaille's brother, James Robitaille, to testify about what someone else had told him. During James Robitaille's testimony the following occurred:
 "Q [Prosecutor]: On May 11 of last year do you recall an incident involving your brother?
 "A [James Robitaille]: Yes.
 "Q [Prosecutor]: How did you first come to hear about that?
 "A [James Robitaille]: Off of the news. I was fishing and a girl that I know, one of my friends, called me and was messing around with the phone and she asked me, she said, `Which one of your brothers done went out here and killed somebody.' I didn't know what to think. And I said, `Are you sure.' And she said, Yes.' I turned around, me and my wife, went to the house where he was at."
James Robitaille then explained that he had told the authorities where they could locate his brother.
Rule 801(c), Ala.R.Evid., states:
 "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."
James Robitaille's testimony as to what someone else told him was not offered to prove the truth of the matters asserted. "`[The hearsay rule] does not exclude extrajudicial utterances offered merely to prove the fact of the making or delivery thereof, or to explain subsequent conduct of a hearer.'"Ashford v. State, 472 So.2d 717, 719
(Ala.Crim.App. 1985), quoting 22A C.J.S. Criminal Law
§ 718 (1961). The testimony was offered to show why James Robitaille telephoned the authorities. This testimony was not hearsay and was correctly admitted into evidence.
 B.
Robitaille argues that it was error to allow Investigator Heath Taylor to testify as to what others told him during the investigation.[10] Specifically, he argues that the following testimony was hearsay:
 "Q [Prosecutor]: On May 11 of last year did you get a call involving Wilson Earl Robitaille?
 "A [Taylor]: Yes, we did.
 "Q [Prosecutor]: What was the nature of that call?
 "A [Taylor]: That Sheriff Boswell had received a call from Marion County Sheriff, I assume that's who called Sheriff Boswell, and asked them for some *Page 58 
assistance in trying to locate Mr. Robitaille in a case they had that morning in Hamilton.
 "Q [Prosecutor]: What did you do next?
 "A [Taylor]: At about five o'clock p.m. Sheriff Boswell called myself and our Patrol Lieutenant and our Chief Deputy to the office and he explained to us what happened up there in Hamilton and said that Mr. Robitaille was currently living here on Laurel Street off of Woodland Drive in Phenix City. He asked if I would pick up the case from there, try to locate Mr. Robitaille and see if there was any violations that probation holds or anything for Hamilton that we could have.
 . . . .
 "Q [Prosecutor]: Who is Sheriff Purser?
 "A [Taylor]: Sheriff of Marion County. In my best recollection, I was told, or learned, that he had made some phone calls to the sheriff of Russell County to learn the whereabouts of Mr. Robitaille."
We have reviewed the pages cited by Robitaille in his brief to this Court; the pages contain testimony concerning the course of the investigation and its focus on Robitaille as the primary suspect.
As we stated in Wilson v. State, 571 So.2d 1237,1240-41 (Ala.Crim.App. 1989), rev'd on other grounds,571 So.2d 1251 (Ala. 1990):
 "`[M]any statements have been admitted as exceptions to the hearsay rule upon the rationale that such statements were admitted for some purpose other than to prove the truth of the statements.' [C. Gamble, McElroy's Alabama Evidence § 242.01(1) (3d ed. 1977)]. See also Clontz v. State, 531 So-2d 60, 61 (Ala.Cr.App. 1988) (wherein a probation officer was allowed to testify that he first became aware the defendant was not at his address through a telephone call from the appellant's mother, because `the testimony was not introduced as proof of the matter asserted, but rather as the motive behind the probation officer's beginning his investigation'); Molina v. State, 533 So.2d 701, 714
(Ala.Cr.App. 1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989) (wherein a police officer was allowed to testify to information concerning a vehicle suspected to be involved in drug activity, received through, a radio dispatch, because it was not offered to prove the truth of the contents of the dispatch, but `to explain the reason he pursued and subsequently stopped the defendant'); Petite v. State, 520 So.2d 207, 211 (Ala.Cr.App. 1987) (a radio broadcast, stating that a burglary was in progress, was not hearsay as it was not introduced to prove the truth of the matter asserted, `but rather for the purpose of explaining why Officer Stafford went to the property'); Thomas v. State, 520 So.2d 223, 226 (Ala.Cr.App. 1987) (wherein an officer was allowed to identify people he spoke with and places he went before finding the defendant, because `[t]he fact of the conversations . . . was offered to explain the officer's actions and presence at the scene — not for the truth of the matter asserted')."
More recently in Deardorff v. State, [Ms. CR-01-0794, June 25, 2004] ___ So.2d ___, ___(Ala.Crim.App. 2004), we stated:
 "A review of the record demonstrates that Agent Montgomery's testimony and Karen and Greg's testimony about Turner's will, and particularly the addendum to the will, was given in context of the investigation of the case and the reasons for the actions the police took. It was by definition not hearsay and it was properly admitted into evidence. *Page 59 
We have considered cases presenting similar circumstances and have found no error in the admission of the testimony. For example, in Smith v. State, 795 So.2d 788
(Ala.Crim.App. 2000), a police officer testified that, during a search of the house belonging to the defendant's mother, she told him that the defendant had put some clothes in the washing machine; Smith argued that the testimony was prejudicial hearsay. We held:
 "`[T]his statement was elicited to establish the reasons for the officer's action and the reasons the officers searched certain areas of the trailer. It was not offered for the truth of the matter asserted and was not hearsay. "The fact of the conversations in this case was offered to explain the officer's actions and presence at the scene — not for the truth of the matter asserted. Accordingly, it was not hearsay. Clark v. City of Montgomery, 497 So.2d 1140, 1142 (Ala.Cr.App. 1986)." Thomas v. State, 520 So.2d 223 (Ala.CrApp. 1987).'
"795 So.2d at 814.
 "In D.R.H. v. State, 615 So.2d 1327
(Ala.Crim.App. 1993), the appellant argued that hearsay had erroneously been admitted when the officers were permitted to testify about what the confidential informant had told them. We disagreed, found that the evidence was not hearsay, and stated, `[The officers'] testimony was received to show the reasons for the officers' actions and how their investigation focused on a suspect. Sawyer v. State, 598 So.2d 1035 (Ala.Cr.App. 1992).' 615 So.2d at 1330. In accord, Miller v. State, 687 So.2d 1281, 1285 (Ala.CrimApp. 1996)."
The challenged testimony was by definition not hearsay and was properly admitted into evidence.
 C.
Robitaille also argues that it was reversible error to elicit testimony from Officer Jerry Feltman, chief of the Hamilton Police Department, as to what John Fikes had told police. The following occurred:
 "Q [Defense counsel]: Mr. [John] Fikes had just come forward to the other officer once he heard about the murders?
 "A [Officer Feltman]: No. Once I got here and I observed the scene, at that point I started putting out information trying to locate `Billy' Robitaille. I wanted to know where he was, where he had been. And as we are putting this information out trying to gather the information, we obtained the information from Mr. Fikes that `Billy' Robitaille had been to his house earlier that day."
Initially, we observe that the above question was elicited from defense counsel, not the State; therefore, if error did occur it was invited by defense counsel's question. "Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby." Phillips v. State, 527 So.2d 154, 156 (Ala. 1988). "The doctrine of invited error applies to death-penalty cases and operates to waive any error unless the error rises to the level of plain error." Snyder v. State,893 So.2d 488, 518 (Ala.Crim.App. 2003).
Moreover, the record shows that John Fikes testified that Robitaille had stopped by his house on the day of the murders. As we have stated:
 "`Testimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.' Yeomans v. State, 641 So.2d 1269, 1272 *Page 60 
(Ala.Crim.App. 1993). `The erroneous admission of evidence that is merely cumulative is harmless error.' Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App. 1995), aff'd, 675 So.2d 905 (Ala. 1996)."
Snyder, 893 So.2d at 545. For these reasons we find no plain error.
 VI.
Robitaille further argues that Dr. Embry was improperly allowed to testify outside his field of expertise. Specifically, he asserts that Dr. Embry was allowed to testify about the position of Trent Taylor's body when he was stabbed.
The following occurred during Dr. Embry's testimony when he was discussing Trent's injuries:
 "Q [Prosecutor]: Now, neither Robin nor Alisa had wounds like that that went all of the way through?
 "A [Dr. Joseph Embry]: No, sir.
 "Q [Prosecutor]: What would you think would tend to cause those wounds to go all of the way through? Does that tell you anything?
 "A [Dr. Embry]: Well they are about six inches deep which would indicate the dimensions of the knife. And some of the wounds went through the bone and some of the wounds did not. It was impossible for me to track the wounds from front to back and with confidence know which wounds went all of the way through his body and whether it went through bone, but it does suggest going through skin twice that a large amount of force was applied.
 "Q [Prosecutor]: Was it possible that he was laying on anything?
 "A [Dr. Embry]: It is possible, yes, sir.
 "Q [Prosecutor]: That he was on the floor or laying on a hard surface when he was stabbed those two times?
 "A [Dr. Embry]: Yes, it is possible.
 "Q [Prosecutor]: Anything about those wounds that would make that more or less probable?
 "A [Dr. Embry]: Not that I know."
(Emphasis added.) We have long held:
 "`In a murder prosecution it is not permissible for a witness, including a medical expert, to draw conclusions for the jury as to the relative positions of the parties at the time of the shooting from a mere examination of the wounds. It is not competent for a witness, expert or nonexpert, to draw inferences for the jury from the slant or angle of the wound as to the relative positions of the combatants when the fatal shot was fired. "This would be invasive of the province of the jury and a matter of which they would be quite as competent to judge as the witness, having been given a description of the wound." Mathis v. State, 15 AlaApp. 245, 248, 73 So. 122, 124
(1916).
 "`However, a properly qualified expert may testify to the "path of flight" or trajectory of the bullet, Wilbanks v. State, 42 AlaApp. 39, 151 So.2d 741, cert. denied, 275 Ala. 701, 151 So.2d 744 (1963). He may testify to the slant or angle of the gunshot wound and describe its character. Woods v. State, 54 AlaApp. 591, 310 So.2d 891 (1975); Mathis v. State, supra. An expert may testify about the direction from which the bullet was fired or the blow was struck, Blackmon v. State, 246 Ala. 675, 680, 22 So.2d 29 (1945), Richardson v. State, 37 AlaApp. 194, 65 So.2d 715 (1953), and may state the distance between the deceased and the barrel of the weapon at the time the fatal shot was fired. Straughn v. State, 270 Ala. 229, 121 So.2d 883 (I960).' *Page 61 
 "Ivey v. State, 369 So.2d at 1276, 1280, (Ala.CrApp. 1979), writ denied, 369 So.2d 1281 (1979) (on rehearing). See also Raspberry v. State, 615 So.2d 657 (Ala.Crim.App. 1992). In this case, the coroner did not testify concerning the relative position of the parties at the time of the murder. He only discussed the angle of the victim's wounds, testimony which is permissible. Ivey; Raspberry."
Lane v. State, 673 So.2d 825, 828-29
(Ala.Crim.App. 1995). Dr. Embry did not testify concerning the positions of both the victim and the defendant at the time that Trent was stabbed to death; his testimony merely acknowledged possibilities concerning Trent's position.
Moreover, even if we were to hold that Dr. Embry's testimony was impermissible we would find no reversible error for the reasons set forth by the Alabama Supreme Court in Ex parteDavis, 554 So.2d 1111, 1114 (Ala. 1989):
 "Dr. Embry testified . . . about the relative positions of the parties. The prosecutor and Dr. Embry even demonstrated the relative positions of the parties during the questioning. Petitioner argues that this testimony and demonstration invaded the province of the jury and were injurious to his substantial rights, citing Smith v. State, 466 So.2d 1026
(Ala.Crim.App. 1985); Wilson v. State, 430 So.2d 891 (Ala.Crim.App. 1983); and Ivey v. State, 369 So.2d 1276 (Ala.Crim.App. 1979), cert. denied, 369 So.2d 1281 (Ala. 1979). Each of the cases cited by the petitioner involved a homicide by shooting, and in each case the defendant claimed accident or self-defense; the prejudicial error in each case occurred because the relative positions of the parties constituted a material inquiry of critical importance. In this case, the petitioner's defense at trial was an alibi: that he was not at the scene of the crime and that someone else must have robbed, sodomized, and murdered the victim. The testimony concerning the position of the assailant, when he stabbed the victim in the back 17 times was not of critical importance to any issue at trial. We find a compelling distinction between the facts of those cases cited by petitioner and the facts and issues of this case; therefore, we hold that the trial court did not commit error injurious to the petitioner's substantial rights by allowing Dr. Embry to testify as to the relative positions of the parties."
Here, as in Davis the cause of death was undisputed. Robitaille's defense was that someone else committed the murders. The possible position of Trent's body when he was stabbed was not of "critical importance to any issue at trial."Davis, 554 So.2d at 1114. Accordingly, we find no reversible error.
 VII.
Robitaille argues that the prosecutor's allegedly improper actions denied him his right to due process and a fair trial. Robitaille cites several instances in support of this contention.
When reviewing claims of prosecutorial misconduct we apply the standards set out by this Court in McNabb v. State,887 So.2d 929, 987-88 (Ala.Crim.App. 2001):
 "`"This court has stated that `[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.' Bankkead v. State, 585 So.2d 97, 106 (Ala.Crim.App. 1989), remanded on other grounds, *Page 62 585 So.2d 112 (Ala. 1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App. 1992), rev'd on other grounds, 625 So.2d 1146 (Ala. 1993). See also Henderson v. State, 583 So.2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). `In judging a prosecutor's closing argument, the standard is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."' Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). `A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.' Roberts v. State, [735 So.2d 1244 (Ala.Crim.App. 1997)], aff'd, [735 So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999)]. Moreover, `statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.' Bankhead, 585 So.2d at 106. `Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App. 1978), and that court is given broad discretion in determining what is permissible argument.' Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id."'"
We have also stated:
 "`In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict.' Smith v. State, 698 So.2d 189, 202-03
(Ala.Cr.App. 1996), aff'd, 698 So.2d 219 (Ala.), cert. denied 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300
(1997) (citations omitted); Bush v. State, 695 So.2d 70, 131 (Ala.Cr.App. 1995), aff'd, 695 So.2d 138 (Ala. 1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) (citations omitted). ` "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144, 157
(1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).
 "In Darden v. Wainwright, the United States Supreme Court stated:
 "`[I]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 699 F.2d [1031] 1031
at 1036 [(1983)]. The relevant question is whether the prosecutors' comments "so infected the trial with, unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).'
 "477 U.S. at 181, 106 S.Ct. at 2471, 91 L.Ed.2d at 157."
Butler v. State, 781 So.2d 994, 1003-04
(Ala.Crim.App. 2000). "The absence of an objection in a case involving the death penalty does not preclude review of the *Page 63 
issue; however, the defendant's failure to object does weigh against his claim of prejudice." Ex parte Boyd,715 So.2d 852, 855 (Ala. 1998)
 A.
Robitaille first argues that the prosecutor improperly applauded and shouted "Bravo" after Robitaille had concluded his testimony.
The following occurred at the end of Robitaille's testimony:
 "[Prosecutor]: (Clap, clap, clap, clap, clap).
 "[Defense counsel]: Judge, I object.
 "[Prosecutor]: Bravo.
 "The Court: Sustained.
 "[Defense counsel]: I move for a mistrial.
 "The Court: Don't do anything like that again.
 "[Prosecutor]: Yes, sir."
The record shows that at the beginning of trial the circuit court instructed the jury that anything the attorneys said was not evidence. Also, during closing statements the prosecutor apologized for his conduct and said:
 "I do want to apologize for two things. First of all, the fool stunt I played yesterday when I stood up and I clapped. I never should have done that and I apologize to y'all. Never should have. That was what I call a mistake from the heart. I was so furious, I just, that clouded my judgment. I should not have done that. That was wrong. I apologize if that offended anybody on the jury. That never should have happened. I'm experienced enough, I'm old enough, and I should have known better, and I do apologize."
While we do not condone the prosecutor's actions, we cannot say that they so infected the trial with unfairness that Robitaille was denied a fair trial. See Darden v. Wainwrright,477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
 B.
Robitaille also argues that the prosecutor improperly testified when he was cross-examining Robitaille. The following occurred:
 "Q [Prosecutor]: You said [Stuart Taylor] gave you 17 pounds of drugs?
 "A [Robitaille]: Yes, sir.
 "Q [Prosecutor]: Seventeen pounds of what?
 "A [Robitaille]: Crystal meth.
 "Q [Prosecutor]: Crystal meth. You may or may not know, I'm the narcotics prosecutor for Marion County and Winston County and have been for the past nine years before being D.A. If we ever saw 17 pounds of dope, we would about fall out in the floor."
Robitaille did not object to the issue now raised on appeal; therefore, we evaluate this claim for plain error. See Rule 45A, Ala.R.App.P.
The above remarks were, at the time, based on facts not in evidence. However, on rebuttal the State presented the testimony of Bobby Blaylock, chief agent for the Marion County Drug Task Force. Blaylock testified:
 "Q [Prosecutor]: What is the standard unit of sale for methamphetamine?
 "A [Blaylock]: Generally you buy, if you are just looking at a street buy, generally we try to go for a gram. That's our standard street buy. Of course, if we go into, you know, to try to get some weight, we will go for what is commonly called an eight ball, a little over three and a half grams methamphetamine. It is rare that people are willing, in our area to deal with a lot of *Page 64 
street sales, but we have been able to make dealings on ounces to be delivered.
 "Q [Prosecutor]: That's pretty large amount one ounce?
 "A [Blaylock]: Yes, sir.
 "Q [Prosecutor]: Rarely can you make a deal for that much?
 "A [Blaylock]: It doesn't come as often as we would like."
Based on the evidence that was submitted in rebuttal we cannot say that the prosecutor's remarks so infected the trial with unfairness that Robitaille was denied a fair trial.
Moreover, we have reviewed all the remarks made by the prosecutor and can find no evidence that any remarks so infected the trial with unfairness that Robitaille was denied a fair trial. See Darden v. Wainwright.
 VIII.
Robitaille argues that the circuit court erroneously allowed two videotapes that showed Robitaille in handcuffs and shackles to be admitted into evidence. Specifically, Robitaille argues that the videotapes were not relevant and were introduced for one purpose — to show his bad character.
The record shows that the only objection made to the videotapes was that there was no proper predicate for their admission. A review of the record also shows that at a pretrial hearing defense counsel stipulated to the authenticity of the videotapes. There was no objection made in the circuit court that the videotapes were not relevant to Robitaiile's guilt and should not be admitted. Thus, we review this issue for plain error. See Rule 45A, Ala.R.App.P.
We have reviewed the videotapes that were introduced. On each videotape Robitaille made statements to reporters. In the first videotape a reporter asked Robitaille: "Do you have anything to say?" He replied: "I never meant to hurt anybody." In the second videotape another reporter asked: "How are you doing? Anything you want to say to the Taylor family?" He replied, "Sorry." The reporter then asked: "Sorry for what?" Robitaille replied, "For what I did."
Rule 401, Ala.R.Evid., states: "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
 "Alabama courts have repeatedly held that the trial court has broad discretion in determining the admissibility of evidence, and that the trial court's determination will not be reversed unless the court has abused its discretion. E.g., Gavin v. State, 891 So.2d 907, 963 (Ala.CrimApp. 2003). Rule 402, Ala. R. Evid., states that all relevant evidence is admissible, unless otherwise precluded by law. . . . As with the determination of admissibility, trial courts have broad discretion in determining whether evidence is relevant, and a court's determination will not be reversed unless the decision constituted an abuse of discretion. Gavin
at 963."
Yeomans v. State, 898 So.2d 878, 894
(Ala.Crim.App. 2004). "The test of relevancy sanctioned by the Alabama appellate courts has been described as a `liberal test of relevancy under which evidence is admissible if it has any probative value, however slight, upon a matter in the case.'"Moody v. State, 888 So.2d 532, 584
(Ala.Crim.App. 2003), quoting McElroy's Alabama Evidence
§ 21.01(1) (5th ed. 1996).
Clearly, the admissions made by Robitaille on the two videotapes were relevant to prove Robitaiile's guilt; therefore, the *Page 65 
videotapes were correctly received into evidence at trial.
Moreover, the fact that the video-tapes showed Robitaille in handcuffs and shackles was not sufficient, in and of itself, to exclude their admittance. The Alabama Supreme Court in Exparte Roberts, 735 So.2d 1270, 1275 (Ala. 1999), addressing a similar claim, stated:
 "We agree with the Court of Criminal Appeals that the trial court did not abuse its discretion in admitting the two photographs of Roberts retrieving evidence, even though those photographs showed him to be handcuffed. We are persuaded by the Court of Criminal Appeals' reasoning and that of the cases upon which it relied, that a photograph of a defendant in handcuffs or otherwise detained may be admitted into evidence so long as the photograph has probative value and is relevant."
(Footnote omitted.) The videotapes of Robitaille's admissions to reporters were correctly received into evidence.
 IX.
Robitaille argues that the circuit court erroneously allowed improper rebuttal evidence to be introduced at the guilt phase. Robitaille specifically argues: "There was no new information, no attack to defend against, and no sound reason to allow the State to present a second case in chief, using the same evidence that had been available during the first case in chief."
After Robitaille testified that he did not commit the triple homicide and that he had been at the Taylor house but had been knocked unconscious by an unknown assailant, the State offered several rebuttal witnesses. Investigator Kenneth Martin Mays testified that Robitaille confessed that he killed Alisa, Trent, and Robin. The confession was played to the jury. In regard to rebuttal evidence we have stated:
 "`The admission of rebuttal evidence is within the discretion of the trial judge. Crow v. State, 365 So.2d 1254 (Ala.Cr.App. 1978), cert. denied, 365 So.2d 1256 (Ala. 1979). "The State may, in the discretion of the trial, court, introduce in rebuttal any competent evidence which explains or is a direct reply to or a contradiction of material evidence by the defendant." Sprinkle v. State, 368 So.2d 554 (Ala.Cr.App. 1978), writ quashed 368 So.2d 565 (Ala. 1979) (emphasis added [in Norris]).'
 "Norris v. State, 429 So.2d 649, 650
(Ala.Crim.App. 1982). See also Bishop v. State, 656 So.2d 394, 397-98 (Ala.Crim.App. 1994), and Strong v. State, 538 So.2d 815, 817
(Ala.Crim.App. 1988). Further, `[i]t is within the discretion of the trial court to receive, in rebuttal, testimony which more properly should have been offered as part of the case in chief. Ford v. State, 383 So.2d 601, 604
(Ala.Crim.App. 1980). Section 15-14-4, Ala. Code 1975, provides:
 `"The court may, at its discretion, at any time before the conclusion of the argument, when it appears to be necessary to the due administration of justice, allow a party to supply an omission in the testimony on such terms and under such limitations as the court may prescribe.'
 "`This court has previously held that the trial court has great discretion in allowing the prosecution or the defense to present additional testimony, whether that evidence was omitted in the case-in-chief or on rebuttal, at any time before the case is submitted to the jury.' Little v. State, 676 So.2d 959, 963
(Ala.Crim.App. 1996). See also Barger v. State, 562 So.2d 650, 653 (Ala.Crim.App. 1989) ('A *Page 66 
trial court has broad discretion to reopen evidence at any time prior to the close of final argument.')."
Minor v. State, 914 So.2d 372, 399
(Ala.Crim.App. 2004). See State v. Butler, 631 So.2d 22, 27
(La.Ct.App. 1994) (no reversible error in allowing rebuttal evidence which was a repeat of evidence that was admitted in State's case-in-chief); People v. Thornton, 54 Ill.App.3d 202, 369 N.E.2d 358, 11 Ill.Dec. 904 (1977) (no reversible error in allowing police officer to repeat testimony in rebuttal).
For the reasons stated in Minor and the cases cited above, we cannot say that the circuit court abused its discretion.
 X.
Robitaille next argues that there was insufficient evidence to convict him of capital murder. Specifically, he argues that the evidence against him was tainted with a coerced confession and that the properly admitted evidence was not sufficient to convict him.[11]
 "Beckworth argues that the trial court erred when it denied his motion for a directed verdict because, he argues, `[w]ithout the wrongfully admitted statements by Beckworth, there was not legal evidence sufficient to convict Beckworth.' (Beckworth's brief at p. 116.)
 . . .
 "`"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Cr.App. 1984), aff'd, 471 So.2d 493
(Ala. 1985).' Powe v. State, 597 So.2d 721, 724 (Ala. 1991). It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt, Pennington v. State, 421 So.2d 1361 (Ala.Cr.App. 1982); rather, the function of this Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. Davis v. State, 598 So.2d 1054 (Ala.Cr.App. 1992). Thus, `[t]he role of appellate courts is not to say what the facts are. [Their role] is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978) (emphasis original)."
Beckworth v. State, 946 So.2d 490, 531-32
(Ala.Crim.App. 2005), quoting Ex parte Woodall,730 So.2d 652, 658 (Ala. 1998).
The State's evidence tended to show that on May 11, 2001, Stuart Taylor arrived at his home and discovered the dead bodies of his wife and daughter. His son's body was later discovered by police. The pathologist testified that all three victims had been stabbed to death.
Robitaille confessed that he murdered Alisa, Robin, and Trent Taylor, and he gave a detailed account of the injuries that he inflicted on each victim. Those details were corroborated by the wounds each victim sustained. When Robitaille was arrested he was in possession of a leatherman's tool. This tool was consistent with some of the injuries sustained by Alisa. After Robitaille confessed, he led police to a swampy area in Lee County where, he said, he had disposed of some of the evidence. Police discovered Alisa's purse wrapped in a shirt. Also, forensic evidence *Page 67 
showed that two fingerprints that had been taken from the storm door at the Taylor house matched Robitaille's finger-prints. In rebuttal, the State presented the testimony of two inmates who had been incarcerated with Robitaille. Both testified that Robitaille confessed to them that he had murdered a woman and her two children.
Clearly, the State's evidence was more than sufficient to convict Robitaille of capital murder.
 XL
Robitaille argues that the circuit court's jury instructions were erroneous because the jury was not fully instructed concerning Count V of the indictment.
After the jury instructions were given in the guilt phase, counsel announced "I'm satisfied with the charge." There were no objections made to any jury instructions given in the guilt phase; therefore, we are limited to a plain-error analysis. Rule 45A, Ala.R.App.P.
The circuit court gave the following instruction on the lesser-included offense of murder as charged in Count V of the indictment:
 "As to Count Five, charges the intentional death of Trent Taylor during robbery, if you are not convinced that he is guilty of capital murder but you are convinced beyond a reasonable doubt that he is guilty of murder, it would be your duty to convict him of that offense. And the form of your verdict would be: We the jury, find the defendant Wilson Earl Robitaille guilty of murder under Count Five of the indictment."
When the circuit court gave the instructions related to the other counts, the court concluded each instruction by stating:
 "If, on the other hand, you are not convinced that he is guilty of either capital or plain or simple murder, then it would be your duty to acquit him of that count. And the form of your verdict would be: We, the jury, find the defendant not guilty under Count Three of the indictment."
The circuit court did not give this same instruction when it concluded its instruction on the lesser-included offense of murder as charged in Count V of the indictment.
When reviewing a challenged jury instruction, we apply the following principles:
 "`"In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir. 1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that `an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.' Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, Z2A U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699
(1998)."'
"Broadnax v. State, 825 So.2d 134, 196
(Ala.Crim.App. 2000), quoting Pilley v. State,789 So.2d 870, 882-83 (Ala.Crim.App. 1998). Moreover, `[w]hen reviewing a trial court's jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State,779 So.2d 1225 (Ala.Cr.App. 1999).' Johnson v. State,820 So.2d 842, 874 (Ala.Crim.App. 2000)."
Snyder v. State, 893 So,2d at 548.
Here, the record shows that the jury was instructed numerous times that it could acquit Robitaille if it found that there was not sufficient evidence to convict *Page 68 
him. Also, the verdict form related to Count V contained a designation for a not-guilty verdict. Based on the record in this case we cannot say that any reasonable juror would have misinterpreted the circuit court's instructions. Therefore, we find no plain error.
 XII.
Robitaille next argues that he was deprived of the effective assistance of counsel. He cites numerous instances of alleged ineffective assistance in support of this contention. Here, Robitaille did not file a motion for a new trial alleging that his counsel's performance was ineffective.
The difficulty of reviewing claims of ineffective assistance of counsel on direct appeal, when those issues have not been developed on the record, was addressed by the United States Supreme Court in Massaro v. United States,538 U.S. 500, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003). The United States Supreme Court stated:
 "When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose. Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial. The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the Strickland analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse. See Guinan [v. United States, 6 F.3d 468 (7th Cir. 1993)], at 473 (Easter-brook, J., concurring) ('No matter how odd or deficient trial counsel's performance may seem, that lawyer may have had a reason for acting as he did. . . . Or it may turn out that counsel's overall performance was sufficient despite a glaring omission . . .'). The trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them. And evidence of alleged conflicts of interest might be found only in attorney-client correspondence or other documents that, in the typical criminal trial, are not introduced. See, e.g., Billy-Eko [v. United States 8 F.3d 111 (2d Cir. 1993)], at 114. Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial."
538 U.S. at 504-05, 123 S.Ct. 1690. The Massaro Court further stated:
 "Even meritorious claims would fail when brought on direct appeal if the trial record were inadequate to support them. Appellate courts would waste time and resources attempting to address some claims that were meritless and other claims that, though colorable, would be handled more efficiently if addressed in the first instance by the district court on collateral review."
538 U.S. at 506-07, 123 S.Ct. 1690. See also United Statesv. Gordon, 346 F.3d 135, 137 (5th Cir. 2003) ("This is not the rare case in which a claim of ineffective representation can be resolved on direct appeal. The record has not been developed *Page 69 
with regard to counsel's motivation for his trial tactics.").
In Ex parte Frazier, 758 So.2d 611 (Ala. 1999), the Alabama Supreme Court noted that the Court of Criminal Appeals is obliged by Rule 45A, Ala.RApp.P., to review a claim of ineffective assistance of counsel on direct appeal in a death-penalty case:
 "A defendant seeking a new trial based on a claim of ineffective assistance of counsel should raise this issue in a timely motion for a new trial. See Rule 24.1, Ala. R.Crim. P.; Ex parte Ingram, 675 So.2d 863 (Ala. 1996). Ordinarily, a defendant's failure to raise the claim in this manner will preclude review of this issue on direct appeal. See Ingram, 675 So.2d at 865. However, in a death-penalty case, the Court of Criminal Appeals will review the defendant's claim of ineffective assistance of counsel on direct appeal, under the plain-error rule, even if he did not preserve the issue in a timely motion for a new trial. See Rule 45A, Ala. R.App. P."
758 So.2d at 615-16 (footnote omitted). Therefore, we are limited to reviewing these ineffective-assistance-of-counsel claims for plain error. See Rule 45A, Ala. R.App.P.
To prevail on a claim of ineffective assistance of counsel the petitioner must satisfy the test articulated by the United States Supreme Court in Strickland v. Washington,466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must show: (1) that counsel's performance was deficient, and (2) that he was prejudiced as a result of the deficient performance.
 "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."
Strickland v. Washington, 466 U.S. at 689,104 S.Ct. 2052 (citations omitted). As the United States Supreme Court further stated:
 "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable .precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy *Page 70 
measure of deference to counsel's judgments."
466 U.S. at 690-91,104 S.Ct. 2052.
 A.
Robitaille first argues that his counsel failed to object to hearsay evidence and to leading questions. His brief on these two issues consists of one paragraph devoted to hearsay and one paragraph devoted, to leading questions. Robitaille's brief does not identify what hearsay evidence and what leading questions were not objected to at trial.
 "[Effectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made. Effectiveness of counsel is not measured by whether counsel objected to every question and moved to strike every answer."
Brooks v. State, 456 So.2d 1142, 1145
(Ala.Crim.App. 1984). As we further stated in Moore v.State, 659 So.2d 205, 209 (Ala.Crim.App. 1994):
 "Objections are a matter of trial strategy, and an appellant must overcome the presumption that `counsel's conduct falls within the wide range of reasonable professional assistance,' that is, the presumption that the challenged action `might be considered sound trial strategy.' Strickland, 466 U.S. at 687-88, 104 S.Ct. at 2064, 80 L.Ed.2d at 693 (1984). Again, the appellant has not shown how she was prejudiced by trial counsel's failure to make objections."
The record fails to show that counsel was ineffective in regard to this claim.
 B.
Robitaille also argues that his counsel was ineffective for failing to request expert assistance in securing DNA evidence, investigating evidence of mitigation, and conducting a private investigation and a mental evaluation.
Counsel filed the following pretrial motions: a motion for funds for a presentence investigation, a motion to review and test the physical evidence, and a motion for mental evaluation to evaluate Robitaille's competency to stand trial and to review Robitaille's mental state at the time of the murders. Robitaille's counsel also moved to continue the case because the State had not completed the tests on the physical evidence that had been collected.
The forensic mental evaluation was conducted by Dr. Kathy A. Ronan, a psychologist at Taylor Hardin Secure Medical Facility in Tuscaloosa. Ronan stated in the mental evaluation that it was her opinion that Robitaille had no major mental illnesses, that his full scale IQ was 94, and that he was competent to stand trial and to aid in his defense.
There is no evidence in the record indicating that counsel failed to investigate the areas challenged by Robitaille in his brief. Based on the sparse record we cannot say that counsel was ineffective.
 C.
Robitaille next argues that counsel failed to present any meaningful evidence in mitigation.
Robitaille testified at the penalty phase and told the jury that he grew up in an abusive home with a father who was an alcoholic. His parents separated when he was six years old. When he was 12 years old his father "tired" of him and put him out of the house. He was first arrested when he was 10 years old. Robitaille also testified that he has two daughters and that he had a son who had drowned.
The record also shows that two of Robitaille's brothers telephoned the authorities when they learned that Robitaille was *Page 71 
wanted for a triple homicide. Robitaille did testify that none of his family, except his one brother who testified for the State, attended the trial. However, the record does not show why he had no family in attendance. Neither does the record show what other mitigating evidence counsel should have presented.
In effect, Robitaille requests that we find counsel's performance per se ineffective because counsel did not present more mitigation evidence at the penalty phase.
 "When claims of ineffective assistance of counsel involve the penalty phase of a capital murder trial the focus is on `"whether `the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" ` Jones v. State, 753 So.2d 1174, 1197
(Ala.Crim.App. 1999), quoting Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir. 1992). See also Williams v. State, 783 So.2d 108
(Ala.Crim.App. 2000). An attorney's performance is not per se ineffective for failing to present mitigating evidence at the penalty phase of a capital trial. See State v. Rizzo, 266 Conn. 171, 833 A.2d 363
(2003); Howard v. State, 853 So.2d 781
(Miss. 2003), cert. denied, 540 U.S. 1197 (2004); Battenfield v. State, 953 P.2d 1123
(Okla.Crim.App. 1998); Conner v. Anderson, 259 F.Supp.2d 741 (S.D.Ind. 2003); Smith v. Cockrell, 311 F.3d 661 (5th Cir. 2002); Duckett v. Mullin, 306 F.3d 982 (10th Cir. 2002), cert. denied, [538 U.S. 1004,] 123 S.Ct. 1911 (2003); Hayes v. Woodford, 301 F.3d 1054 (9th Cir. 2002); and Hunt v. Lee, 291 F.3d 284 (4th Cir.), cert. denied, 537 U.S. 1045 (2002)."
Adkins v. State, 930 So.2d 524, 536
(Ala.Crim.App. 2001) (on return to third remand).
 "`Prejudicial ineffective assistance of counsel under Strickland cannot be established on the general claim that additional witnesses should have been called in mitigation. See Briley v. Bass, 750 F.2d 1238, 1248 (4th Cir. 1984); see also Bassette v. Thompson, 915 F.2d 932, 941 (4th Cir. 1990). Rather, the deciding factor is whether additional witnesses would have made any difference in the mitigation phase of the trial.' Smith v. Anderson, 104 F.Supp.2d 773, 809 (S.D.Ohio 2000), aff'd, 348 F.3d 177 (6th Cir. 2003). `There has never been a case where additional witnesses could not have been called.' State v. Tarver, 629 So.2d 14, 21 (Ala.Crim.App. 1993)."
McWlliams v. State, 897 So.2d 437, 453
(Ala.Crim.App. 2004), rev'd on other grounds in Ex parteJenkins, 972 So.2d 159 (Ala. 2005).
Robitaille sought leave, and was granted permission, to file a supplemental brief addressing the effect of Wiggins v.Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471
(2003), on this issue. The United State Supreme Court inWiggins v. Smith held that counsel's performance in that case was ineffective for failing to conduct an adequate investigation into mitigation. The Court stated:
 "In finding that [trial counsel's] investigation did not meet Strickland's performance standards, we emphasize that Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the `constitutionally protected independence of counsel' at the heart of Strickland, 466 U.S., at 689, *Page 72 
 104 S.Ct. 2052. We base our conclusion on the much more limited principle that `strategic choices made after less than complete investigation are reasonable' only to the extent that `reasonable professional judgments support the limitations on investigation.' Id., at 690-691, 104 S.Ct. 2052. A decision not to investigate thus `must be directly assessed for reasonableness in all the circumstances.' Id., at 691, 104 S.Ct. 2052.
 "Counsel's investigation into Wiggins' background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records — evidence that would have led a reasonably competent attorney to investigate further."
539 U.S. at 533-34,123 S.Ct. 2527.
Robitaille's supplemental brief consists of attachments and exhibits concerning an attorney's representation of a capital defendant. These exhibits were never presented to the circuit court. As we have stated:
 "It is well settled that `attachments to briefs are not considered part of the record and therefore cannot be considered on appeal.' Huff v. State, 596 So.2d 16, 19 (Ala.Crim.App. 1991). This Court is bound by the record on appeal and cannot consider facts not contained in the record. See Smith v. State, 745 So.2d 922, 930 (Ala.Crim.App. 1999). Therefore, in deciding this issue we do not consider the State's attachment to its brief."
Morrow v. State, 928 So.2d 315, 321 n. 5 (Ala.Crim.App. 2004). Accordingly, we will not consider the attachments and exhibits that were filed with the supplemental brief because they were not contained in the certified record on appeal.
Based on the record in this case we cannot say that counsel in the penalty phase of Robitaille's trial was ineffective.
 D.
Robitaille argues that counsel failed to subpoena and interview witnesses. The record contains no evidence concerning this claim.
 "[T]he failure to interview or take the depositions of the State's witnesses for impeachment purposes is not prejudicial per se. See McCleskey v. Kemp, 753 F.2d 877, 900 (11th Cir. 1985) (en banc) (holding no prejudice shown where attorney failed to interview two of State's witnesses and potential defense witnesses); Boykins v. Wainwright, 737 F.2d 1539, 1543 (11th Cir. 1984) (holding no prejudice shown where attorney failed to interview prosecution's expert witnesses), cert. denied, [470] U.S. [1059], 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); Solomon v. Kemp, 735 F.2d 395, 402 (11th Cir. 1984) (holding no prejudice shown where attorney failed to talk to all of the State's witnesses and did not seek funds for an investigator), cert. denied, [469] U.S. [1181], 105 S.Ct. 940, 83 L.Ed.2d 952 (1985)."
Aldrich v. Wainurright, 777 F.2d 630, 636-37 (11th Cir. 1985). We cannot say that counsel's performance was ineffective.
 E.
Robitaille also argues that counsel was ineffective for failing to conduct any factual investigation of the case.
Here, we do not have the benefit of counsel's testimony concerning the preparations he made for Robitaille's capital trial as this issue was not developed on the record. The attorney-fee declaration is contained in the record and shows that *Page 73 
counsel billed for approximately 210 hours that were related to this case. The record also shows that counsel filed numerous and varied pretrial motions. Counsel moved for a change of venue. That motion was granted and the case was moved to Cullman County. Counsel also filed a multitude of motions that are typically filed in capital cases. However, counsel had the Herculean task of representing a defendant who had confessed to murdering Alisa Taylor and her two children.
As this Court stated in Brooks v. State,929 So.2d 491, 497 (Ala.Crim.App. 2005), quoting Grayson v.Thompson, 257 F.3d 1194, 1218 (11th Cir. 2001):
 "`[W]e note that the record is silent as to why trial counsel did not pursue a motion to suppress the evidence obtained from Grayson incident to his arrest on Fourth Amendment grounds; Grayson's habeas counsel did not inquire as to trial counsel's reasons for not raising such a claim either during counsel's deposition or his testimony at the state habeas hearing. "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore, `where the record is incomplete or unclear about [counsel's actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.'" Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir. 2000) (en banc) (quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir. 1999)).'"
See also Grossman v. Crosby, 359 F.Supp.2d 1233, 1252
(M.D.Fla. 2005); Thompson v. State, 9 S.W.3d 808,813-14 (Tex.Crim.App. 1999). Based on the record that we have before us we cannot say that counsel's performance was ineffective.
 Penalty-Phase Issues XIII.
Robitaille argues that the death penalty is unconstitutional because, he argues, it constitutes cruel and unusual punishment and Alabama's capital-murder statute is unconstitutional because, he says, it violates the Eighth andFourteenth Amendments of the United States Constitution.
 "This Court has upheld the death penalty against similar constitutional attacks. As we stated in Clark v. State, 896 So.2d 597, (Ala.Crim.App. 2003) (opinion on return to remand and on application for rehearing):
 "`[B]oth the death penalty in general and Alabama's capital-murder statute in particular have been upheld against a variety of constitutional attacks. See Harris v. Alabama, 513 U.S. 504
(1995) (holding that Alabama's capital statute does not violate the Eighth Amendment); Gregg v. Georgia, 428 U.S. 153, 169 (1976) (plurality opinion) (holding that "the punishment of death does not invariably violate the Constitution"); Projfitt v. Florida, 428 U.S. 242
(1976) (holding that the death penalty is not per se violative of the Eighth Amendment); and Ex parte Taylor, 808 So.2d 1215 (Ala. 2001), cert. denied, 534 U.S., 1086 (2002) (holding that Alabama's capital-murder statute does not violate the Fourteenth Amendment). Contrary to Clark's contention, the death penalty is not per se unconstitutional and, therefore, Clark's argument is meritless.'
"896 So.2d at 642-43."
Flowers v. State, 922 So.2d 938, 958
(Ala.Crim.App. 2005). *Page 74 
 XIV.
Robitaille argues that the circuit court's jury instructions were erroneous because they informed the jury that its verdict in the penalty phase was merely advisory.
 "A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App. 1992). When reviewing a trial court's instructions,'" the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.'" Selfv. State, 620 So.2d 110, 113 (Ala.Cr.App. 1992) (quoting Porter v. State, 520 So.2d 235, 237
(Ala.Cr.App. 1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App. 1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App. 1992)."
Williams v. State, 795 So.2d 753, 780
(Ala.Crim.App. 1999). We have upheld similar instructions given in the penalty phase of a capital trial. In Taylor v.State, 666 So.2d 36, 50-51 (Ala.Crim.App. 1994), aff'd,666 So.2d 73 (Ala. 1995), we stated:
 `"[W]e reaffirm the principle that, in Alabama, the "judge, and not the jury, is the final sentencing authority in criminal proceedings." Ex parte Hays, 518 So.2d 768, 774 (Ala. 1986); Beck v. State, 396 So.2d [645] at 659 [(Ala. 1980)]; Jacobs v. State, 361 So.2d 640, 644
(Ala. 1978), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979).' Ex parte Giles, 632 So.2d 577, 583 (Ala. 1993), cert. denied, [512] U.S. [1213], 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994). `The jury's verdict whether to sentence a defendant to death or to life without parole is advisory only.' Bush v. State, 431 So.2d 555, 559
(Ala.Crim.App. 1982), aff'd, 431 So.2d 563 (Ala. 1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). See also Sockwell v. State, [675] So.2d [4] (Ala.CrApp. 1993). `We have previously held that the trial court does not diminish the jury's role or commit error when it states during the jury charge in the penalty phase of a death case that the jury's verdict is a recommendation or an "advisory verdict." White v. State, 587 So.2d 1218
(Ala.Cr.App. 1990), aff'd, 587 So.2d 1236 (Ala. 1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142
(1992).' Burton v. State, 651 So.2d 641
(Ala.Cr.App. 1993)."
(Footnote omitted.)
 XV.
Last, as required by § 13A-5-53, Ala. Code 1975, we must address the propriety of Robitaille's capital-murder convictions and death sentence. Robitaille was convicted of six counts of capital murder. Count I charged Robitaille with murdering Alisa, Robin, and Trent during one act or pursuant to one scheme or course of conduct. See § 13A-5-40(a)(10), Ala. Code 1975. Counts II and III charged Robitaille with murdering Robin and Trent — both of whom were under the age of 14. See § 13A-5-40(a)(15), Ala. Code 1975. Counts IV, V, and VI, charged the intentional murder of Alisa Taylor, Robin Taylor, and Trent Taylor during the course of a robbery. See § 13A-5-40(a)(2), Ala. Code 1975.
The record shows that Robitaille's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.
The circuit court stated the following concerning the aggravating circumstances:
 "The capital offense was committed by a person under sentence of imprisonment. The defendant was charged with the offense of stalking in the Circuit *Page 75 
Court of Marion County, Alabama. Pursuant to a plea agreement with the state, the defendant was sentenced as a habitual felony offender with three or more prior felony convictions to 15 years on August 10, 1999. This, sentence was split and the defendant was ordered to serve four months in custody and the balance of the sentence was suspended and the defendant placed on probation for fourteen years. The defendant was still on probation for this offense at the time of the commission of the capital murder offenses on May 10, 2001, for which he has been convicted in this case. This was testified to by the state's witness and by the defendant himself."
Section 13A-5-49(1), Ala. Code 1975, provides that committing a murder while the defendant was "under sentence of imprisonment" is an aggravating circumstance. "Under sentence of imprisonment" is defined in § 13A-5-39(7), Ala. Code 1975:
 "As used in Section 13A-5-49(1), the term means while serving a term of imprisonment, while under a suspended sentence, while on probation or parole, or while on work release, furlough, escape, or any other type of release or freedom while or after serving a term of imprisonment, other than unconditional release and freedom after expiration of the term of sentence."
The circuit court also found the following aggravating circumstances:
 "That the defendant intentionally murdered two or more persons by one act or pursuant to one scheme or course of conduct. The defendant was convicted of the intentional murder of Alisa Taylor, her daughter Robin Taylor, and her son Trent Taylor by stabbing them as charged under count one of the indictment. The jury verdict establishes this aggravating circumstance and is well supported by the evidence. [See § 13A-5-49(9), Ala. Code 1975.]
 "The capital offense was committed while the defendant was engaged in the act of robbery in the first degree. The defendant was convicted under counts four, five and six of the indictment which charged the intentional killings of Alisa Taylor, Trent Taylor, and Robin Taylor, respectively, while he was engaged in the commission of robbery. These convictions establish this aggravating circumstance and are well supported by the evidence. [See § 13A-5-40(a)(4), Ala. Code 1975.]
 "The capital offense was particularly heinous, atrocious, [or] cruel when compared to other offenses. It would serve no purpose to give a blow by blow, or stab by stab, description of how the defendant murdered the victims in this case. But it can be truthfully said his acts are good examples of all the adjectives which describe this aggravating circumstance. He used a total of at least five dangerous instruments in committing these murders — a leatherman's tool, a butcher knife, pair of scissors, and at least two steak knives, one of which he broke the blade off in Robin Taylor's chest. All of these tools were not used on all the victims but more than one was used on some of them. Each of them sustained multi-stab wounds and he obviously went from one to the other stabbing them until they were all dead with the exception of Trent who may not have been stabbed until his sister was already dead. He stabbed Robin to death as he was talking to her and telling her to be quiet or to quit screaming. She made it to the carport in an effort to escape but was caught and brought back in where she was stabbed in the kitchen and on into her bedroom where she finally died. Her blood painted a picture of pain and torture as the prints of `Angel Wings' were left on the floor at her side. All of *Page 76 
this took place in the presence of her mother and brother. She had of course seen her mother stabbed before her death.
 "Then the defendant proceeded to resume the stabbing of Alisa Taylor. As he did this she asked him why he was doing this to which he replied that he had `gone too far now.' She had told Trent, her son, to hide in the storage space in a room off the hall where she was. As she lay dying the defendant hunted Trent down and stabbed him to death. He then returned to Alisa's body where he said he told her he was sorry and that she tried to say something but then went lifeless.
 "Each of these brutal murders would have met all the requirements of this aggravating circumstance if they had been committed separate and apart from each other. Obviously Robin died also knowing that her mother, who had already been stabbed, and brother were about to meet the same fate. Alisa died after seeing her daughter being stabbed and hearing her screams. She lay helpless and dying as her son was stabbed to death. Trent was stabbed to death after witnessing the fatal stabbing of his mother and sister.
 "Heinous, atrocious, and cruel — these are adjectives not strong enough to describe what happened on that fateful day. These were savage, torturous killings."
The jury's verdict in the guilt phase established beyond a reasonable doubt that the murders were committed pursuant to one course of conduct and that the murders were committed during a robbery. Therefore, the application of §§ 13A-5-49(9) and 13A-5-49(4), Ala. Code 1975, was proper in this case. Moreover, the circuit court's detailed explanation of why it applied the aggravating circumstance that the offense was especially heinous, atrocious, or cruel complies with the Alabama Supreme Court's decision in Ex parte Kyzer,399 So.2d 330, 334 (Ala. 1981).
The circuit court found as a statutory mitigating circumstance that the capacity of the defendant to appreciate the criminality of his conduct was impaired. The circuit court stated:
 "That the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. The defendant argued that he had some sort of mental or emotional disorder as diagnosed by the psychologist who did the mental evaluation of him prior to trial. It is not clear to this judge whether he was trying to establish the existence of this ground or whether he was arguing a non-statutory mitigating circumstance. Whatever the case may be the court has read and re-read the report of the defendant's mental evaluation and can find nothing therein that would indicate that the defendant's capacity to appreciate the criminality of his conduct was substantially impaired. Neither is there anything in all the rest of the evidence to establish this.
 "The psychologist did state that the defendant had some personality disorder. I think that all will agree that anyone who could savagely stab to death a mother and her two young children has some sort of personality disorder. Such a person simply does not have a conscience. It is only common sense that a person's conscience helps one to conform his conduct to the requirements of the law, especially when that law relates to vicious acts toward others. It only follows then that the capacity of a person without a conscious to conform his conduct to the requirements of the law is substantially impaired.
 "The court finds that this mitigating circumstance does exist. The question *Page 77 
then becomes how much weight to assign it."
In regard to nonstatutory mitigating circumstances the circuit court found:
 "In addition to the consideration of all the statutory mitigating circumstances the court has considered the other matters argued by the defendant to be mitigating circumstances.
 "The first was that his childhood was abusive — that his father used to beat him and ran him off from home at the age of twelve years. In the history that he gave the psychologist that performed the mental evaluation of the defendant he stated that his father would beat him and his brothers when they tried to come to the aid of their mother when he was abusing her. He further stated that these beatings stopped when his mother left. He was ten years old at that time and continued to live with his father for two more years without being beaten.
 "Obviously the defendant and his siblings had the same childhood background. They were subjected to the same treatment. It is not known whether they are pillars of the community, but it is significant to note that the defendant's two brothers actually took him into `custody' when they heard he was wanted for the crimes in this case. One of his brothers came and testified that he and his other brother went to the place where the defendant was staying to make sure that he did not run off before law enforcement officers arrested him. They called the law enforcement officers and told them where their brother was but they reached his location before the authorities. The brother testified that while waiting for the officers to arrive he observed the defendant throw something out into the weeds beyond the edge of the yard. Shortly afterwards the dog came out of the weeds into the yard with something in its mouth. This turned out to be the bloodstained leatherman's tool introduced into evidence as one of the murder weapons.
 "Obviously, the common childhood background of the defendant and his two brothers did not cause them to turn out the way he did. Also it is interesting to note that the beatings stopped when their mother left home and the father stopped drinking.
 "The court does not question that defendant was subjected to abuse as a child but the duty of a person to take responsibility for his own conduct far outweighs any consideration of leniency for one who has had less than a model upbringing. Otherwise, none but persons with an excellent past would be fully punished for their wrongdoing.
 "The court finds that at least in this case the evidence does not rise to the level of making this a mitigating circumstance. The childhood abuse may have been a factor in causing the defendant to develop a lack of conscience but to find this as a separate mitigating circumstance would be to make both the cause and the effect a mitigating circumstance.
 "The next non-statutory circumstance the defendant argued is that his two daughters, in their early teens, would be without a father should he be put to death. The defendant offered no evidence that he had ever demonstrated any love for his daughters by supporting them nor that they had any close relationship with him. In fact for the most of their lives he has been in prison and there was no evidence that they had ever lived with him. It is also noteworthy that they were not at this trial. At least it was not called to the attention of the court if they were, Apparently, the only relative of the defendant's at the trial was his brother who testified against him. *Page 78 
 "The court just does not find this to be a mitigating circumstance. Otherwise every parent with a living child would have at least one mitigating circumstance in every capital murder case in which they might be convicted."
After reviewing the record we agree with the circuit court's findings. However, as required by § 13A-5-53(b)(2), Ala. Code 1975, this Court must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Robitaille's death sentence. After an independent weighing, we are more than convinced, as was the circuit court, that death was the appropriate sentence for Robitaille's brutal actions.
As required by § 13A-6-53(b)(3), Ala. Code 1975, we must determine whether Robitaille's sentence is either disproportionate or excessive to the sentences imposed in other capital cases. Robitaille viciously stabbed and killed a mother and her two small children while they were in their home. He then took money and other items from the home. Robitaille's sentence is not excessive or disproportionate to the sentences imposed in similar cases. See Ex parte Roberts,735 So.2d 1270 (Ala. 1999); Baldwin v. State, 456 So.2d 129
(Ala. 1984); Bell v. State, 475 So.2d 601
(Ala.Crim.App. 1984).
Last, we have searched the record for any error that may have adversely affected Robitaille's substantial rights and have found none. See Rule 45A, Ala.R.App.P.
Robitaille's capital-murder convictions and his sentence of death are due to be, and are hereby, affirmed.
AFFIRMED.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.
[2] At times in the record this defendant is referred to as Wilson "Billy" Robitaille. However, the indictment refers to the defendant as Wilson "Earl" Robitaille.
[3] Count I charged Robitaille with murdering Alisa, Robin, and Trent Taylor during one act or pursuant to one scheme or course of conduct. See § 13A-5-40(a)(10), Ala. Code 1975. Counts II and III charged Robitaille with murdering Trent and Robin — both of whom were under 14 years of age. See § 13A-5-40(a)(15), Ala. Code 1975. Counts IV, V, and VI charged Robitaille with murdering Alisa, Trent, and Robin, during the course of a robbery. See § 13A-5-40(a)(2), Ala. Code 1975. Robitaille was convicted of all six counts as charged in the indictment.
[4] Robitaille's entire argument on this issue consists of three sentences.
[5] The Alabama Lawyer, Bar Directory Edition, 2004-2005, shows that counsel was licensed to practice law in 1981.
[6] The United States Supreme Court in Rushen v.Spain, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983), held that a violation of a defendant's right to be present during trial is subject to a harmless-error analysis. Alabama, likewise, has adopted this view. See Ex parte DeBruce,651 So.2d 624 (Ala. 1994).
[7] As we have stated: "[F]ollowing the scope of review used in Carroll [v. United States, 267 U.S. 132 (1925),] and applying it to a motion to suppress a defendant's statement, we are not limited merely to that evidence presented at the suppression hearing, but may also consider the testimony given before the jury." Henry v. State, 468 So.2d 896,899 (Ala.Crim.App. 1984).
[8] It is uncontested that all questioning ceased when Robitaille invoked his right to counsel at this time.
[9] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).
[10] Robitaille's brief does not identify what specific instances he challenges on appeal; he merely recites several page numbers that correspond to pages in the record.
[11] We have already addressed the validity of the admittance of Robitaille's confession; therefore, we will not again address that issue. See Part IV, supra.